# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JANICE D. ABSHER,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:04cv00110 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **JO ANNE B. BARNHART**, | ) | |
| Commissioner of Social Security, | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Janice D. Absher, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423. (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Absher protectively filed her application for DIB on or about August 22, 2003, alleging disability as of April 2, 1998, based on back, hip and leg pain and depression. (Record, ("R."), 46-49, 54, 80, 84-85.) Absher's claim was denied both initially and on reconsideration. (R. at 27-31, 32, 34-36.) Absher then requested a hearing before an administrative law judge, ("ALJ"), (R. at 37.) The ALJ held a hearing on June 17, 2004, at which Absher was represented by counsel. (R. at 173-208.)

By decision dated July 30, 2004, the ALJ denied Absher's claim. (R. at 13-19.) The ALJ found that Absher met the disability insured requirements of the Act for disability purposes through December 31, 1999.[1] (R. at 18.) The ALJ further found that Absher had not engaged in substantial gainful activity since her alleged onset of disability. (R. at 18.) The ALJ found that the medical evidence established that Absher had severe impairments, namely severe musculoskeletal impairments, but he found that Absher did not have an impairment or combination of impairments listed

---

[1]Thus, for purposes of this Memorandum Opinion, it must be determined whether Absher was disabled on or before December 31, 1999.

-2-

at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ further found that Absher's allegations regarding her limitations as of December 31, 1999, were not totally credible. (R. at 18.) The ALJ concluded that Absher retained the residual functional capacity to perform light work[2] as of her date last insured. (R. at 18.) Thus, the ALJ found that Absher could perform her past relevant work as a kitchen worker and a nursery worker. (R. at 18.) Therefore, the ALJ found that Absher was not disabled as defined by the Act and was not eligible for benefits. (R. at 19.) *See* 20 C.F.R. § 404.1520(f) (2005).

After the ALJ issued this decision, Absher pursued her administrative appeals, (R. at 9), but the Appeals Council denied her request for review. (R. at 5-8.) Absher then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2005). The case is before this court on Absher's motion for summary judgment filed May 25, 2005, and the Commissioner's motion for summary judgment filed June 27, 2005.

## *II. Facts and Analysis*[3]

Absher was born in 1947, (R. at 46, 178), which, at the time of her date last insured, classified her as a person "closely approaching advanced age" under 20

---

[2]Light work involves lifting items weighing up to 20 pounds at a time and occasionally lifting or carrying items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2005).

[3]Because Absher contests only the findings regarding an alleged mental impairment and spinal disorder, only the medical evidence relevant to these issues will be discussed.

C.F.R. § 404.1563(d). She has a fifth-grade education[4] and past relevant work experience as a kitchen worker and a nursery worker. (R. at 55, 60, 63, 85-86, 92, 178-82.)

At her hearing, Absher testified that she last worked as a kitchen worker in April 1998, washing dishes, mopping floors, stocking and occasionally cooking. (R. at 178-80.) She stated that she had to stop working due to pain. (R. at 182.) Absher stated that she previously worked part-time for a landscaping company. (R. at 181-82.) Absher testified that she experienced low back pain that radiated into her right hip and leg. (R. at 183-84.) She stated that she had difficulty standing for long periods of time when she worked as a kitchen worker, noting that she could do so for approximately 20 minutes. (R. at 184.) Absher further stated that lifting aggravated her back pain. (R. at 185.) She stated that she began having difficulty with her right hip approximately four years prior to the hearing and that it had progressively worsened. (R. at 186.) Absher testified that she had arthritis in various parts of her body and that she had difficulty gripping objects. (R. at 191.) Finally, Absher testified that she experienced depression and anxiety, noting that she experienced crying spells during the time that she last worked and the year thereafter. (R. at 192.) She stated that she was taking Paxil. (R. at 191.)

Absher testified that during 1999, she could perform some housework with her daughters' help. (R. at 193.) However, she stated that she could perform such chores for only approximately 20 to 30 minutes without interruption. (R. at 193.) Absher

---

[4]Absher noted on two separate Disability Reports that she completed the sixth grade, but she testified at her hearing that she completed the fifth grade. (R. at 60, 88, 178.)

-4-

testified that she used to sew, work in her flowers and visit people, but could no longer do so due to pain. (R. at 193-94.) She stated that she attended church, but had difficulty sitting. (R. at 194.) Absher testified that her pain caused difficulty concentrating. (R. at 194.) She stated that she sometimes drove, but not for long distances. (R. at 194.) She stated that she could sit for only "minutes" without interruption. (R. at 195.) Absher stated that when she worked as a kitchen worker, she would use a heating pad to alleviate her pain. (R. at 195.) Absher testified that she walked around her house with a cane, but noted that she had difficulty walking on uneven surfaces or up stairs. (R. at 196-97.)

Dr. Edward Allen Griffin, M.D., a medical expert, also was present and testified at Absher's hearing. (R. at 198-202.) Dr. Griffin testified that, prior to Absher's date last insured, she had some degenerative disc disease with no evidence of radiculopathy. (R. at 199.) Dr. Griffin noted that, although medical records from the period subsequent to her date last insured showed that Absher had developed some right hip pain and fairly advanced degenerative arthritis, there were no treatment records or x-rays that allowed him to extrapolate such findings back to the date last insured. (R. at 200.) Dr. Griffin further noted that Absher was given Paxil and Librium only intermittently for a mood disorder. (R. at 200.) He testified that there was a possible undeveloped diagnosis of sleep apnea that would impact her mood disorder, but he noted that Absher had declined to undergo a sleep study. (R. at 200.) Dr. Griffin noted that he agreed with the evaluation of Dr. Konrad as to Absher's condition at the time of her date last insured. (R. at 200.) Dr. Griffin testified that if Absher's testimony regarding her hip impairment were deemed credible, then she could stand for a total of two to three hours, but for only 30 minutes without

interruption, that she could only occasionally bend, stoop and squat, that she could not climb ladders and that she could only occasionally climb stairs. (R. at 201.) He further noted that she would be limited to working on level surfaces. (R. at 201.)

Cathy D. Sanders, a vocational expert, also was present and testified at Absher's hearing. (R. at 202-07.) Sanders classified Absher's past work as a kitchen worker and as a nursery worker as light and unskilled. (R. at 204.) Sanders was asked to consider a hypothetical individual of Absher's age as of the date last insured, education and work experience, who was limited as set forth in Dr. Griffin's testimony regarding Absher's back and in Dr. Konrad's evaluation. (R. at 204.) Sanders testified that such an individual could perform the jobs of a cleaner, a nonconstruction laborer, a hand packager, a stocker, a bagger, a sorter and a grader, all at the light level of exertion and all existing in significant numbers in the national economy. (R. at 205.) Sanders was next asked to consider the same individual, but who was limited as set forth in Dr. Griffin's testimony regarding Absher's hip. (R. at 205.) Sanders testified that such an individual could perform sedentary jobs.[5] (R. at 205.) Sanders was next asked to consider the same hypothetical individual, but who was limited as set forth in Absher's testimony. (R. at 206.) Sanders testified that such an individual could not work. (R. at 206.) Finally, Sanders was asked to consider the first hypothetical individual, but who also experienced pain as often as up to one-third of an eight-hour day which would affect her ability to maintain attention and concentration and to complete tasks in a timely manner. (R. at 206.) Sanders testified that such an individual would be unable to work. (R. at 207.)

---

[5]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. *See* 20 C.F.R. § 404.1567(a) (2005). Sanders did not list specific jobs that Absher could perform at the sedentary level. (R. at 205.)

-6-

In rendering his decision, the ALJ reviewed records from Franklin Ellis, D.C.; Dr. Karl Konrad, Ph.D., M.D.; Dr. G. Parrish, M.D., a state agency physician; Dr. Steven Adkins, M.D.; Scott County Health Department; Dr. George White, M.D., an orthopaedist; and Letcher County Public Schools.

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if she sufficiently explains her rationale and if the record supports her findings.

In her brief, Absher argues that the ALJ erred by failing to find that she suffered from a severe mental impairment. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 4-6.) I find that substantial evidence supports the ALJ's finding on this issue. Again, the issue in this case is whether Absher suffered a severe mental impairment prior to her last insured date, December 31, 1999. Absher saw Dr. Steven Adkins, M.D., from June 13, 1989, through

November 2, 1999. (R. at 148-63.) On May 21, 1990, Dr. Adkins noted that Absher was experiencing anxiety and distress over the recent death of her mother. (R. at 154.) He gave her a prescription for Librium. (R. at 154.) On August 28, 1991, Dr. Adkins diagnosed generalized anxiety disorder and refilled her medication. (R. at 153.) He noted that he was refilling 40 10-milligram tablets, which "generally last[ed] her a long time." (R. at 153.) On September 14, 1993, Dr. Adkins noted that Absher was having some menopausal symptoms with hot flashes, tiredness and depression. (R. at 151.) She was again diagnosed with mild generalized anxiety and her prescription of Librium was refilled. (R. at 151.) On January 28, 1994, Absher was again diagnosed with generalized anxiety and her Librium was refilled. (R. at 150.) On January 6, 1995, Absher noted that she had recently been under a lot of stress. (R. at 150.) Her Librium was again refilled. (R. at 150.) On August 2, 1995, Absher's Librium was again refilled. (R. at 149.) By April 12, 1996, Absher reported feeling "pretty well overall." (R. at 148.) Dr. Adkins noted that he refilled Absher's Librium, which Absher "use[d] occasionally for nervousness." (R. at 148.) On June 8, 1999, Absher saw Dr. Adkins for a check-up of her anxiety. (R. at 157-58.) Dr. Adkins noted that this was her first visit in nearly one year. (R. at 157.) He further noted that Absher's main complaint was menopausal symptoms. (R. at 157.) Absher noted hot flashes, night sweats, mood swings and irritability. (R. at 157.) She also noted that she was more nervous than usual. (R. at 157.) Dr. Adkins noted that Absher had taken Librium "infrequently in the past" and that Absher was requesting a refill. (R. at 157.) Dr. Adkins diagnosed generalized anxiety aggravated by menopause and prescribed Librium. (R. at 157-58.) On November 2, 1999, Dr. Adkins noted that Absher continued to have some menopausal symptoms with emotional fluctuation, hot flashes and some depression. (R. at 155.) Absher was again diagnosed with an

anxiety disorder, not otherwise specified. (R. at 155.)

On October 27, 1997, Absher completed a Health Questionnaire as part of her intake appointment with Franklin Ellis, D.C. (R. at 102-05.) As part of that questionnaire, there were several questions relating to the individual's mental health. Some of these questions included "[d]o you usually feel unhappy and depressed[,]" "[d]o you often cry[,]" "[d]oes worrying continually get you down[]" and "[d]oes every little thing get on your nerves and wear you out[.]" (R. at 105.) Absher answered "no" to all of these questions. (R. at 105.) Interestingly, however, she stated that she was considered a "nervous person." (R. at 105.) To all other questions relating to her mental health, Absher answered "no," indicating no symptoms. (R. at 105.)

On October 14, 1998, Absher saw Dr. Karl W. Konrad, Ph.D., M.D., for a consultative evaluation. (R. at 107-09.) As part of this evaluation, Dr. Konrad performed a mental status examination. (R. at 108.) He noted that Absher was alert and oriented and she appeared to be of average intelligence. (R. at 108.) Her affect was normal. (R. at 108.)

Absher again saw Dr. Adkins on April 6, 2001, at which time her prescription of Librium was refilled. (R. at 121-22.) On November 4, 2003, Dr. Adkins again diagnosed anxiety disorder, not otherwise specified. (R. at 119-20.) Absher saw a family nurse practitioner at Scott County Health Department on January 12, 2003, and was prescribed Paxil. (R. at 129.) However, it is unclear from the treatment notes why Absher was prescribed Paxil. No subjective complaints from Absher were

documented on that date, nor were any specific findings made by the nurse practitioner. (R. at 129.) On October 8, 2003, Absher was diagnosed with depression, again despite any apparent subjective complaints by Absher or any specific findings by the nurse practitioner. (R. at 127.) It appears that she was temporarily switched to Effexor. (R. at 127.)

I note that none of these sources placed any work-related restrictions on Absher based on a mental disorder. I further note that Absher has sought no mental health treatment, nor has any treating source deemed it necessary to refer her for such treatment. It is clear from the treatment notes that Absher's complaints of depression and anxiety can best be characterized as situational, focusing around the death of her mother and the onset of menopause. Moreover, I find that Absher's symptoms were controlled with the "occasional," "infrequent" or "intermittent" use of a rather low dosage of Librium. It is well settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

For all of these reasons, I find that substantial evidence supports the ALJ's finding that Absher did not suffer from a severe mental impairment on or prior to December 31, 1999.

Absher next argues that the ALJ erred by failing to find that she met or equaled the listing for disorders of the spine found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04. (Plaintiff's Brief at 6-7.) For the following reasons, I find that substantial evidence supports the ALJ's finding on this issue.

Section 1.04(A) requires that the disorder result in *compromise of the nerve root or the spinal cord* with (1) evidence of nerve root compression characterized by neuro-anatomic distribution of pain; (2) limitation of motion of the spine; (3) motor loss accompanied by sensory or reflex loss; and (4) if there is involvement of the lower back, positive straight leg raising test. In order for a claimant to demonstrate that her impairments meet or equal a listed impairment, she must prove that she "meet[s] *all* of the specified medical criteria. An impairment that manifests only some of [the] criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).

Here, there is no evidence that Absher experienced compromise of a nerve root or the spinal cord. For instance, on October 24, 1997, Absher saw Ellis for a chiropractic examination. (R. at 93-106.) She exhibited some slight decreased range of motion in flexion of the dorsolumbar spine. (R. at 94.) However, x-rays of the lumbar spine were normal. (R. at 100.) Ellis further noted some hyperlordosis of the lumbar spine, some intervertebral disc thinning at the L5-S1 level and Grade I spondylolisthesis of the lumbar spine. (R. at 100.) He diagnosed L5-S1 pseudoarthrosis of the left transverse process and sacral areas. (R. at 100.) By October 29, 1997, Absher reported a significant improvement in her low back pain. (R. at 147.) Palpation of the lumbar spine showed reduced muscle spasm, and Ellis noted that Absher was improving somewhat more rapidly than expected. (R. at 147.) On October 31, 1997, Absher continued to report improvement. (R. at 147.) Ellis noted no significant muscle spasm, and he stated that Absher's pain was rapidly resolving. (R. at 147.) On November 3, 1997, Absher reported little discomfort. (R. at 147.) Ellis noted no apparent misalignment at the L5 level of the spine. (R. at 147.)

On November 7, 1997,[6] Ellis noted that Absher continued to do well, and on November 14, 1997, he noted that Absher had "done well" the past week, noting that alignment of the L5 level of the spine was good. (R. at 146.) He opined that Absher should be able to go two weeks between chiropractic treatments. (R. at 146.)

On October 14, 1998, Absher saw Dr. Konrad for a consultative evaluation. (R. at 107-09.) A physical examination revealed positive straight leg raising on the right. (R. at 107-08.) However, Dr. Konrad noted that Absher was able to rise from a chair and get onto and off of the exam table without difficulty. (R. at 107.) She walked unassisted without a limp and was able to tandem walk. (R. at 108.) Absher exhibited normal strength in both upper and lower extremities. (R. at 108.) Her reflexes were normal and symmetrical. (R. at 108.) Dr. Konrad noted no sensory radiculopathy or peripheral neuropathy. (R. at 108.) Absher's pulses were 2+, and Dr. Konrad noted no lower extremity signs of arterial insufficiency. (R. at 108.) Dr. Konrad reported that Absher exhibited a modest limited range of motion of the lumbar spine. (R. at 108.) An x-ray of the lumbar spine revealed spondylolysis pars interarticularis of the L5 level, borderline second degree spondylolisthesis, degenerative disc disease of the L5-S1 level with reactive changes, a fractured osteophyte at the L4 level and the presence of additional small osteophytes. (R. at 109.) Dr. Konrad diagnosed Absher with degenerative changes of the lumbar spine with a limited range of motion. (R. at 109.) He opined that she could perform light work. (R. at 109.)

On October 20, 1998, Dr. G. Parrish, M.D., a state agency physician, completed

---

[6]The treatment note actually states the date as November 7, 2004. (R. at 146.) However, this appears to be a typographical error.

-13-

a Physical Residual Functional Capacity Assessment, also concluding that Absher could perform light work. (R. at 110-17.) He imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 112-14.)

On November 4, 2003, nearly four years after her date last insured, Absher complained of back pain for the first time to her treating physician, Dr. Adkins. (R. at 119.) She stated that she experienced right low back pain that radiated into her right hip and leg. (R. at 119.) A physical examination revealed tenderness in the right low back in the sacroiliac area and also laterally over the right hip over the greater trochanter. (R. at 119.) However, Dr. Adkins noted a normal range of motion of the hip and normal flexion of the low back. (R. at 119.) Absher was neurologically intact. (R. at 119.) She was diagnosed with sciatica. (R. at 119.)

On January 12, 2003, a family nurse practitioner at the Scott County Health Department noted that Absher had hip and knee problems. (R. at 129.) On October 8, 2003, Absher complained of severe right hip pain for years, but which had worsened over the past several months with increased stiffness. (R. at 127.) She was diagnosed with right hip pain, possibly due to arthritis. (R. at 127.) It was noted that Absher had a limited range of motion of the back and increased pain with range of motion. (R. at 131.)

On June 2, 2004, Absher saw Dr. H. George White, M.D., an orthopaedist, for an evaluation. (R. at 164-65.) She complained of pain over the greater trochanter of the right hip with radiation into the right groin with some associated right buttock pain. (R. at 164.) She reported that she had experienced such pain for four to five

years, but she noted that it had gradually worsened over the previous two years. (R. at 164.) Absher walked with an antalgic limp off the right hip. (R. at 164.) Rotary manipulation of the right hip was painful. (R. at 164.) Dr. White reported that Absher's neurovascular function was intact in the lower extremities. (R. at 164.) X-rays of the pelvis and right hip showed significant degenerative changes of the right hip. (R. at 164, 166-67.) Dr. White diagnosed progressive degenerative joint disease of the right hip symptomatic for longer than two years and Grade I spondylolisthesis with degenerative changes at the L5-S1 level. (R. at 164-65.) He advised Absher to continue taking Naprosyn. (R. at 165.)

It is apparent from the relevant treatment notes contained in the record that there is no objective evidence that Absher suffered from nerve root compromise or spinal cord compromise at any time relevant to her DIB claim. At most, the treatment notes reveal degenerative disc disease of the low back with some limited range of motion during the relevant time period. For these reasons, I find that substantial evidence supports the ALJ's finding that Absher did not meet or equal the criteria for § 1.04(A) on or before December 31, 1999.

### III. Conclusion

For the foregoing reasons, Absher's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted, and the

Commissioner's decision to deny benefits will be affirmed.

An appropriate order will be entered.

DATED: This 31st day of August, 2005.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-16-